**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| DAVID CONWAY as the special administrator of the estate of SARAH CONWAY, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | No. 25-2533-KHV |
| LANSING OPERATOR, LLC, et al., | ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM AND ORDER**

On September 11, 2025, David Conway, the spouse of Sarah Conway and the special administrator of her estate, filed suit against defendants, alleging negligence resulting in her injury and death at a skilled nursing facility. This matter is before the Court on Defendant Stuart Lindeman's Motion To Dismiss Plaintiffs' Complaint And Memorandum In Support (Doc. #13) and Defendant Windward Health Partners, LLC's Motion To Dismiss Plaintiffs' Complaint And Memorandum In Support (Doc. #14), both filed November 19, 2025. Both motions ask the Court to dismiss plaintiff's complaint for lack of personal jurisdiction. For reasons stated below, the Court overrules defendants' motions.

**Legal Standards**

Rule 12(b)(2), Fed. R. Civ. P., governs motions to dismiss for lack of personal jurisdiction. Plaintiff bears the burden of establishing a prima facie showing of personal jurisdiction. XMission, L.C. v. PureHealth Rsch., 105 F.4th 1300, 1314 (10th Cir. 2024). At the motion to dismiss stage, plaintiff's burden to establish personal jurisdiction is light. Id. Plaintiff may defeat a motion to dismiss by presenting evidence—either uncontested allegations in their complaint or evidence in the form of an affidavit or declaration—that if true would support jurisdiction over

defendants.  Eighteen Seventy, LP v. Jayson, 32 F.4th 956, 965 (10th Cir. 2022).  In determining

whether plaintiff has satisfied his burden, the Court takes as true all plausible, nonconclusory facts

alleged in the complaint and must resolve any factual disputes in favor of plaintiff.  XMission, 105

F.4th at 1307.

## Factual Background

### I.    The Complaint

In September of 2023, Sarah Conway suffered physical abuse by the nursing staff at

Lansing Care and Rehabilitation Center ("Lansing Care and Rehab"), a skilled nursing facility in

Lansing, Kansas.  On October 4, 2023, after her husband and staff at a dialysis clinic raised

concerns about a large bruise on her left arm, medical staff at the University of Kansas Health

System evaluated Mrs. Conway for elder abuse.  Lansing Care and Rehab also failed to take Mrs.

Conway, who suffered from dementia, to a cardiologist appointment and did not reschedule it.  On

an undisclosed date, Mrs. Conway died.  Plaintiff alleges that as a direct and proximate result of

defendants' negligence, Mrs. Conway was harmed and suffered damages, including pain,

suffering, mental anguish, disability, disfigurement and loss of enjoyment of life.

Lansing Operator, LLC ("Lansing Operator") was a Florida limited liability company that

owned, operated, managed, maintained, controlled and did business as Lansing Care and Rehab.

Lansing Operator provided ancillary medical services at Lansing Care and Rehab to Mrs. Conway

and others.  The sole member of Lansing Operator was Coronado Operator, LLC.[1]

Coronado was a Florida company that also owned, operated, managed, maintained and

---

[1]    Plaintiff alleges that both Coronado and Stuart Lindeman are the sole member of Lansing Operator.  Compare Complaint, ¶ 10, with id., ¶ 115. In support of plaintiff's opposition to defendants' motions to dismiss, plaintiff submitted evidence which identifies Coronado as the 100 per cent direct owner of Lansing Care and Rehab.  For purposes of this motion, the Court finds that Coronado is the sole member of Lansing Operator.

controlled Lansing Care and Rehab.  Coronado provided nursing consulting services to Lansing Care and Rehab and exercised control over staffing budgets, development and implementation of nursing policies and procedures, hiring and firing of the administrator and training and supervising nursing staff employees at Lansing Care and Rehab.  The sole member of Coronado was Windward Health Partners, LLC ("Windward").

Windward was a Florida limited liability company that also owned, operated, managed, maintained and controlled Lansing Care and Rehab.  At all times relevant to this action, Windward exercised final authority over staffing budgets, development and implementation of nursing policies and procedures and hiring and firing of Lansing Care and Rehab leadership.  Through its portfolio company, Mission Health Communities, LLC ("Mission Health"), Windward acquired several skilled nursing facilities in Kansas, including Lansing Care and Rehab.[2]  Stuart Lindeman owned all or most of the interest in Windward, exercised complete control and domination over its finances and business practices and gave orders to directors and executives at Windward. Lindeman's control and domination over Windward caused undercapitalization and understaffing of Lansing Care and Rehab while Mrs. Conway resided there.  Windward was a mere instrument of Lindeman.

Mission Health was a Florida limited liability company that also owned, operated, managed, maintained and controlled Lansing Care and Rehab, by exercising final authority over staffing budgets, development and implementation of nursing policies and procedures and hiring and firing of leadership at Lansing Care and Rehab.  Mission Health was a portfolio company of Windward.  Windward was the corporate parent and sole member of Mission Health.

---

[2]     Companies in which private equity firms hold an interest are considered portfolio companies.

Lindeman, a citizen of Florida, was substantially engaged in leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and operation of Lansing Operator. Lindeman exercised final authority over staffing budgets, development and implementation of nursing policies and procedures, hiring and firing of the administrator and appointing the governing body responsible for establishing and implementing policies regarding the management and operation of Lansing Operator. Lindeman operated, managed, maintained and controlled Lansing Operator by binding Lansing Care and Rehab to contracts with related parties. During the time that Mrs. Conway resided at Lansing Care and Rehab, Lansing Operator represented to the United States Centers for Medicare and Medicaid Services ("CMS") that Lindeman exercised operational and managerial control over Lansing Care and Rehab.

Windward, Lindeman, Coronado and Mission Health directed, operated and managed day-to-day functions of Lansing Care and Rehab, including resident care, by developing and implementing policies, practices and procedures affecting all facets of Lansing Care and Rehab, including resident care. Lansing Operator had no autonomy to decide its own financial course, determine its staffing needs or decide what resources were available to the staff.

Count 1 of the Complaint alleges that Windward was the alter ego of Lansing Operator and that it so dominated Lansing Operator that it was its mere instrument and indistinct from Windward. More specifically, Count 1 alleges that (1) Windward owned all or most of the capital stock of Lansing Operator, (2) Windward and Lansing Operator had common directors and officers, (3) Windward financed Lansing Operator, (4) Windward subscribed to all of the capital stock of Lansing Operator and caused the incorporation of Lansing Operator, (5) Lansing Care and Rehab had grossly inadequate capital, (6) Windward paid the salaries and other expenses or

losses of Lansing Operator, (7) Windward used Lansing Operator's property as its own and (8) the directors and executives of Lansing Operator did not act independently in the interest of Lansing Operator but took their orders from Windward in Windward's best interest. Windward's control and domination of Lansing Operator depleted all of the latter's assets, making it unable to pay a judgment resulting from resident care.

Count 2 alleges that Lindeman was Windward's alter ego. Specifically, it claims that Lindeman so dominated Windward that the latter was his mere instrument, indistinct from him, and Lindeman exercised complete control and domination over Windward's finances and practices. More specifically, Count 2 alleges that Lindeman (1) owned all or most of Windward's capital stock, (2) financed Windward, (3) subscribed to all the capital stock of Windward and caused its incorporation, (4) caused Lansing Care and Rehab to have grossly inadequate capital, (5) paid salaries and other expenses or losses of Windward, (6) used Windward's property as his own and (7) gave orders to directors and executives of Windward, who did not act independently in Windward's interest. Lindeman's control and domination of Windward depleted all of Windward's assets, making it unable to pay a judgment resulting from resident care.

Count 3 alleges that as a direct and proximate result of negligence, complete indifference and conscious disregard for the safety of others, defendants harmed Mrs. Conway and caused damages, including pain, suffering, mental anguish, disability, disfigurement and loss of enjoyment of life.

## II.    Affidavit of Stuart Lindeman

The <u>Affidavit Of Stuart Lindeman</u> (Doc. #13-2, Doc. #14-2) filed November 19, 2025,

states as follows:[3]

Lindeman does not operate, own or manage any hospitals or nursing facilities in Kansas. He has never, directly or indirectly, through Mission Health (or others) operated, supervised, governed or managed any aspect of day-to-day operations including patient care, of Lansing Operator or Coronado.  Lindeman has not provided services of any kind to Lansing Operator or Coronado or received compensation for consulting or any other services to Lansing Operator or Coronado.  Lindeman has not had any direct or indirect involvement or control in day-to-day operations of Lansing Operator or Coronado.  He has never executed any contracts with or on behalf of Lansing Operator or Coronado.

Lindeman does not finance Windward.  He does not own all or most of the capital stock of Windward, and he does not subscribe to all of its capital stock.  Lindeman does not pay salaries or other expenses or losses of Windward, Mission Health, Lansing Operator or Coronado.  He does not submit cost reports to CMS on behalf of Lansing Operator or Coronado.  Lindeman is not a member of Lansing Operator, Coronado or Mission Health.  It would be unduly burdensome for him to defend this lawsuit in Kansas.

### III.    Affidavit of Bryan Crino

---

[3]    Lindeman's affidavit states that the Complaint (Doc. #1) alleges that Mrs. Conway was a resident at Lansing Care and Rehab from January to February of 2024.  This is incorrect. The complaint includes excerpts of records that indicate Mrs. Conway began residing at Lansing Care and Rehab in June of 2023 and that doctors and social workers at the University of Kansas evaluated her for elder abuse on October 4, 2023, while she resided at Lansing Care and Rehab. The complaint does not allege other dates when Mrs. Conway resided at Lansing Care and Rehab or when she died.

Lindeman's affidavit limits several statements to "the time of Sarah Conway's admission" to Lansing Care and Rehab.  Affidavit Of Stuart Lindeman (Doc. #13-2, Doc. #14-2) filed November 19, 2025 at 2–3.  Because Lindeman has not cited the actual date of admission alleged in the complaint, the Court disregards the statements which refer to facts limited to "the time of Sarah Conway's admission."

The Affidavit Of Bryan Crino (Doc. #13-1, Doc. #14-1) filed November 19, 2025, states as follows:[4]

Crino manages Windward.  Windward is organized and exists under the laws of Florida with its principal place of business and headquarters in Tampa, Florida.  Windward does not operate any hospitals or nursing facilities in Kansas.  Windward does not own all capital stock of Lansing Operator or Coronado.  Windward has never directly or indirectly, through Mission Health, operated, supervised, governed or managed any aspect of day-to-day operations including patient care, of Lansing Operator or Coronado.  Windward has not provided services of any kind to Lansing Operator or Coronado or received compensation for consulting or other services to them.  Windward has not had any direct or indirect involvement or control in day-to-day operations of Lansing Operator or Coronado.

Windward does not pay salaries of employees of Mission Health, Lansing Operator or Coronado.  Windward does not have common directors or officers with Lansing Operator or Coronado.  Windward has never directed, managed or controlled the activities of Lansing Operator or Coronado.  Windward does not direct the actions of Mission Health or Lansing Operator. Lindeman does not own all or most of Windward's capital stock.  It would be unduly burdensome for Windward to defend this suit in Kansas.

IV.     **Affidavit of Jonathan Steele**

In reply to defendants' affidavits, plaintiff submitted the Affidavit Of Jonathan Steele (Doc. #26-1) filed December 15, 2025, which states as follows:

---

[4]     Crino also incorrectly claims that the complaint alleges that Mrs. Conway was a resident at Lansing Care and Rehab from January to February of 2024.  For the reasons discussed above, the Court disregards Crino's statements which refer to facts limited to "the time of Sarah Conway's admission."  Affidavit Of Bryan Crino (Doc. #13-1, Doc. #14-1) filed November 19, 2025 at 2–3.

On a CMS form for fiscal year 2024, Lansing Operator listed Mission Health Communities in Tampa, Florida as its "home office."

On a Medicare.gov nursing home comparison website, the "Ownership" page for Lansing Care and Rehab listed Coronado as the sole direct owner of Lansing Care and Rehab. As indirect owners, the website listed Windward, Barres, LLC (which Lindeman owns in its entirety) and Curis Holdings, LLC (owned by Windward, Barres, LLC (aka, Lindeman) and one other LLC). The same website named Lansing Operator, Lindeman and Mission Health, among others, as maintaining "operational/managerial control" of Lansing Care and Rehab. See https://www.medicare.gov/care-compare/details/nursing-home/175228?id=00099651-658b-4561-b1cd-f948f29e6de5&state=KS.

## Analysis

### I.    Windward Health Partners, LLC

Windward asserts that plaintiff has not pleaded facts which allow the Court to exercise specific or general jurisdiction over it. Windward further argues that the contacts of Lansing Operator with Kansas cannot be imputed to Windward under a theory of alter ego. Plaintiff argues the Court has specific jurisdiction over Windward based on its own actions and as an alter ego of Lansing Operator. The Court therefore need not consider the question of general jurisdiction and proceeds to a specific jurisdiction analysis.[5]

---

[5]    General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1078 (10th Cir. 2008). Specific jurisdiction exists if the defendant has "purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or related to those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).

For the Court to exercise personal jurisdiction, plaintiff must show that personal jurisdiction is proper under the laws of the forum state and that doing so comports with the due process requirements of the United States Constitution.  See Newsome v. Gallacher, 722 F.3d 1257, 1264 (10th Cir. 2013).  The Kansas long-arm statute permits the exercise of any jurisdiction that is consistent with the United States Constitution.  See Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop., 17 F.3d 1302, 1304–05 (10th Cir. 1994); see also K.S.A. § 60-308(b)(1)(L). Accordingly, the Court need not conduct a separate personal jurisdiction analysis under Kansas law and may proceed directly to the due process inquiry.  See Niemi v. Lasshofer, 770 F.3d 1331, 1348 (10th Cir. 2014) (where long-arm statute confers maximum jurisdiction consistent with Due Process Clause, statutory inquiry effectively collapses into constitutional analysis).  The due process analysis requires the Court to determine (1) whether Windward has "minimum contacts" with Kansas such that it should "reasonably anticipate being haled into court there," World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980), and (2) if Windward's actions establish minimum contacts, whether the exercise of personal jurisdiction "offends traditional notions of fair play and substantial justice." Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 113 (1987).

For a state to have specific personal jurisdiction over a defendant, defendant must purposefully avail itself of the forum state.  Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021). Lansing Operator, Coronado and Mission Health have answered the complaint and have not contested personal jurisdiction, thereby waiving that issue.  Plaintiff asserts that Windward is also subject to personal jurisdiction in Kansas because it is the alter ego of Lansing Operator.  Under Kansas law, one corporation may be the alter ego of another corporation. See Dean Operations Inc. v. One Seventy Assocs., 257 Kan. 676, 680, 896 P.2d 1012, 1016 (1995).

When a non-resident parent business is the alter ego of a resident subsidiary business, the parent may be subject to specific personal jurisdiction. Doughty v. CSX Transp., Inc., 258 Kan. 493, 499–500, 905 P.2d 106, 111 (1995). This determination is a question of fact. Id. Therefore, the conduct of Lansing Operator could provide appropriate grounds for the exercise of personal jurisdiction over Windward even if Windward had no contact with Kansas. For jurisdiction to be proper under the alter ego doctrine, plaintiff must show that Kansas law would pierce the corporate veil or impose liability through agency principles. See Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, LLC, 28 F.4th 996, 1007 (10th Cir. 2022); Lemaster v. Collins Indus., Inc., No. 11-CV-2128-JTM, 2011 WL 5966911, at *3–4 (D. Kan. Nov. 29, 2011).

To treat corporations as alter egos—or pierce the corporate veil—plaintiff must show "such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal." Dean Operations Inc., 257 Kan. at 680, 896 P.2d at 1016. To determine whether plaintiff has satisfied this standard, courts traditionally consult a non-exhaustive list of factors that include (1) whether the parent owns all or a majority of the capital stock of the subsidiary, (2) whether the parent and subsidiary have common directors or officers, (3) whether the parent finances the subsidiary, (4) whether the parent subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation, (5) whether the subsidiary has grossly inadequate capital, (6) whether the parent pays the salaries, expenses or losses of the subsidiary, (7) whether the subsidiary has substantially no business except with the parent or no assets except those that the parent conveys to it, (8) whether the parent's papers and statements of its officers refer to "the subsidiary" as such or as a department or division, (9) whether the directors or executives of the subsidiary act independently in the interests of the subsidiary but take direction from the parent and (10) whether entities observe the

formal legal requirements of the subsidiary as a separate and independent corporation. Doughty, 258 Kan. at 499, 905 P.2d at 111; Cyprus Amax Mins. Co., 28 F.4th at 1008; Pipeline Prods., Inc. v. Madison Cos., LLC, 428 F. Supp. 3d 591, 601 (D. Kan. 2019). These factors are guidelines. Cyprus Amax Mins. Co., 28 F.4th at 1008. No single factor or pre-set combination of factors conclusively determines whether the alter ego doctrine applies. Id. All factual disputes must be resolved in favor of plaintiff unless controverted by defendants' filings or affidavits. See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995).

In their briefing, the parties have relied on the ten traditional Doughty factors listed above. These factors are relevant to the alter ego analysis but they are not a perfect match when discussing the alter ego doctrine in the context of a limited liability company ("LLC"). As opposed to corporations, LLCs are not incorporated, do not issue stock and are owned by members (not shareholders) who own a percentage of the interest in the LLC. As applied here, Windward has not presented evidence which disputes plaintiff's allegations and evidence that (1) Windward finances Lansing Operator, (2) Lansing Care and Rehab has grossly inadequate capital, (3) Windward pays the non-salary expenses and losses of Lansing Operator and (4) the members and managers of Lansing Operator do not act independently in the interest of Lansing Operator but take orders from Windward based on its best interest.[6] These factors weigh in favor of finding

---

[6] Crino makes various convoluted statements about Windward's direction and control, or lack thereof, over Lansing Operator and other defendants. Crino declares that Windward has not had any direct or indirect involvement or control in day-to-day operations of Lansing Operator or Coronado, and that Windward has never directly or indirectly, through Mission Health, operated, supervised, governed or managed any aspect of the day-to-day operations, including patient care of Lansing Operator or Coronado. Crino's statements do not dispute Windward's press release which announced that Mission Health (its portfolio company) "has taken over" skilled nursing facilities in Kansas, including Lansing Care and Rehab. Complaint (Doc. #1), ¶ 22. Doughty's ninth factor focuses on the parent company's directives to the directors or officers of the subsidiary, not the parent's involvement in day-to-day operations of the subsidiary. Crino does not controvert plaintiff's allegations on this point.

that Windward is an alter ego of Lansing Operator.

Through Crino, Windward has presented evidence that it does not pay salaries for employees of Lansing Operator, does not have common members or managers with Lansing Operator or exercise control over day-to-day operations of Lansing Operator. These factors weigh against finding that Windward is the alter ego of Lansing Operator.[7] On balance, however, plaintiff has alleged sufficient facts and presented sufficient evidence to permit an inference that Windward is the alter ego of Lansing Operator.

To establish specific jurisdiction, plaintiff must also show that he would suffer an injustice if the Court gives effect to the legal fiction of separate entities. Doughty, 258 Kan. at 500, 905 P.2d at 111. Plaintiff alleges that Windward's control and domination of Lansing Operator depleted all of the latter's assets, making it unable to pay a judgment resulting from resident care. As evidence, plaintiff provided a 2024 CMS Cost Report, which shows that Lansing Operator has no cash on hand or in banks. Affidavit of Jonathan Steele (Doc. #27-1) at 35. Windward argues that Lansing Operator and Coronado have adequate liability insurance to satisfy a judgment in this case, so plaintiff cannot show an injustice which warrants piercing the corporate veil. In support, Windward relies on a declarations page which reflects insurance for Coronado for October 1, 2023 through October 1, 2024. In addition, Lindeman has provided proof of insurance for April 30, 2023 through April 30, 2024, which includes as insureds Lansing Operator, Coronado, Mission Health and Windward. But Windward has not shown that plaintiff's claims were made or occurred

---

[7]    In addition, Windward presents evidence which does not directly address the Doughty factors and is therefore insufficient to controvert the relevant factors. The Court has disregarded some of Crino's statements because they do not include all of the subsidiaries. For instance, Crino states that Windward does not direct the actions of Mission Health or Lansing Operator—omitting mention of Coronado, the sole member of Lansing Operator. Defendants' corporate disclosure statement reveals that Windward, through Curis Holdings, LLC, is an indirect owner of Coronado.

during the policy period of either policy, that either policy would cover the claims in this case, that the policies would cover all potential damages (including damages for pain and suffering) or that the policyholders have sufficient capital to pay policy deductibles. Absent such evidence, at this preliminary stage, plaintiff has met his burden to show that he will suffer an injustice if the Court declines to treat Windward as an alter ego of Lansing Operator. On this record, plaintiff has established sufficient ground for the Court to exercise specific personal jurisdiction over Windward under an alter ego theory. Doughty, 258 Kan. at 499–500, 905 P.2d at 111.

Once plaintiff establishes that jurisdiction is proper under an alter ego theory of liability, defendant must present a compelling case that jurisdiction offends traditional notions of fair play and substantial justice. Burger King, 471 U.S. at 477. Such cases are rare. Rusakiewicz v. Lowe, 556 F.3d 1095, 1102 (10th Cir. 2009). To determine whether the exercise of jurisdiction is unreasonable, the Court considers (1) the burden on defendant, (2) the forum state's interest in resolving the dispute, (3) plaintiff's interest in receiving convenient and effective relief, (4) the interest of the interstate judicial system in obtaining the most efficient resolution of controversies and (5) the shared interest of the several states in furthering fundamental substantive social policies. OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1095 (10th Cir. 1998). Windward only argues that defending this action in Kansas is burdensome because Windward is a Florida company with a principal place of business in Florida. Kansas has an interest in resolving a dispute alleging bodily harm to a Kansas resident, especially a vulnerable one who relied on a skilled nursing facility for care. Likewise, plaintiff has an interest in receiving convenient relief in Kansas. Even if litigating in Kansas causes some burden to Windward, that burden does not render the exercise of jurisdiction unreasonable where Windward purposefully engaged in business in Kansas. Windward has not carried its burden to present a compelling case that the exercise of

personal jurisdiction in this case would be unreasonable.  Asahi Metal Indus. Co., 480 U.S. at 114 (interests of plaintiff and forum in exercising jurisdiction often justify serious burdens on out-of-state defendant).

## II.     Stuart Lindeman

Lindeman asserts that this Court must dismiss plaintiff's claims against him for lack of personal jurisdiction because plaintiff has not alleged facts that could support specific or general jurisdiction over him.  Because plaintiff does not argue that the Court can exercise general jurisdiction over Lindeman, the Court addresses Lindeman's challenges to specific jurisdiction. Lindeman argues that he did not have any contact with Kansas relative to Mrs. Conway's care and treatment and had no involvement in day-to-day operation of Lansing Operator or Coronado. Lindeman further argues that if other defendants had contacts with Kansas, they cannot be imputed to him under theories of agency, joint venture or alter ego.  Plaintiff alleges that the Court has specific jurisdiction over Lindeman as Windward's alter ego and based on Lindeman's own contacts with Kansas related to Lansing Care and Rehab.  Plaintiff argues that the Lindeman affidavits do not controvert the complaint's core allegations, which the Court must accept as true, that Lindeman was substantially engaged in and exercised final authority over several facets of the operation of Lansing Care and Rehab.

To determine whether Lindeman is the alter ego of Windward for the purposes of personal jurisdiction, the Court applies the Doughty factors.  Lindeman has not presented evidence which disputes plaintiff's allegations that (1) he caused the formation of Windward, (2) he exercised complete control and domination over Windward's finances and business practices, (3) through Windward, he caused Lansing Care and Rehab to have grossly inadequate capital, (4) he caused Windward's liabilities to exceed its assets during 2021, 2022 and 2023 and (5) he gave orders to

members and managers of Windward, who did not act independently in Windward's best interest. Lindeman presented evidence which indicates that he (1) does not own all or most of the interest in Windward, (2) does not finance Windward and (3) does not pay salaries or other expenses or losses of Windward. While this is a closer call, based on all the facts and circumstances, the Court finds that plaintiff has met his light preliminary burden to show that Lindeman acted as the alter ego of Windward.

As noted, plaintiff must also show that he would suffer an injustice if the Court gives effect to the legal fiction of separate entities. Doughty, 258 Kan. at 500, 905 P.2d at 111. Plaintiff alleges that Lindeman depleted all of Windward's assets, making it unable to pay a judgment resulting from its care of residents, including Mrs. Conway. Lindeman argues that no injustice warrants veil-piercing because Lansing Operator and Coronado have liability insurance sufficient to satisfy a judgment in this case. In support of this argument, Lindeman relies on an insurance policy for the period of April 30, 2023 through April 30, 2024, which includes as insureds Lansing Operator, Coronado, Mission Health and Windward. As with Windward, Lindeman has not shown that plaintiff's claims were made during the policy period of this claims-made policy, that the policy covers the claims in this case, that the policy would cover all potential damages (including damages for pain and suffering) and that the policyholders have sufficient capital to pay policy deductibles. Absent such evidence, plaintiff has met his light burden at this preliminary stage to show that he will suffer an injustice if the Court declines to treat Lindeman as an alter ego of Windward. Therefore, the Court exercises specific personal jurisdiction over Lindeman under an alter ego theory.

The Court further finds that Lindeman's own direct contacts with Kansas related to Lansing Care and Rehab provide a separate and independent basis for the Court to exercise specific

personal jurisdiction over him.  As noted above, the Court takes as true all plausible, nonconclusory facts alleged in the complaint (and additional evidence provided by plaintiff in response to defendants' motion) and must resolve any factual disputes in favor of plaintiff.  XMission, 105 F.4th at 1307.  These facts establish that (1) since October of 2019, Lindeman has exercised "operational/managerial control" over Lansing Care and Rehab, Affidavit Of Jonathan Steele (Doc. #26-1) at 39, (2) Lindeman, through Barres, LLC, is an indirect owner of Lansing Care and Rehab, (3) Lindeman was "substantially engaged" in and exercised "final authority" over several facets of the operation of Lansing Care and Rehab, Complaint (Doc. #1), ¶ 41, (4) Lindeman bound Lansing Care and Rehab to related-party contracts that diverted funds from resident care and (5) in a press release announcing that Mission Health had taken over 14 skilled nursing facilities in Kansas, including Lansing Care and Rehab, Lindeman (as CEO of Mission Health) stated that he was "thrilled with the quick turnaround we were able to achieve in transferring key personnel and operational responsibilities of these facilities," id., ¶ 22.  While Lindeman states that he did not have involvement in day-to-day operations of Lansing Operator or Coronado, his statement does not controvert plaintiff's allegations and evidence that Lindeman exercised oversight and control of management and operations of Lansing Care and Rehab.  Lindeman's actions therefore establish minimum contacts with Kansas.  Asahi Metal Indus. Co., 480 U.S. at 113.

Once plaintiff establishes minimum contacts, defendants must present a compelling case that jurisdiction offends traditional notions of fair play and substantial justice.  Burger King, 471 U.S. at 477.  As discussed above, to determine whether the exercise of jurisdiction is unreasonable, the Court consider five factors.  Lindeman only argues that defending this action in Kansas would be burdensome because his home is Florida.  Given plaintiff's interests in exercising jurisdiction,

and those of the state of Kansas, Lindeman's claim that jurisdiction would be unreasonable is not compelling. <u>Asahi Metal Indus. Co.</u>, 480 U.S. at 114.

**IT IS THEREFORE ORDERED** that <u>Defendant Stuart Lindeman's Motion To Dismiss Plaintiffs' Complaint And Memorandum In Support</u> (Doc. #13) filed November 19, 2025 is **OVERRULED**.

**IT IS FURTHER ORDERED** that <u>Defendant Windward Health Partners, LLC's Motion To Dismiss Plaintiffs' Complaint And Memorandum In Support</u> (Doc. #14) filed November 19, 2025 is **OVERRULED**.

Dated this 20th day of May, 2026 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge